# Exhibit A

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

**Case No.: 25-cv-60803-WPD**

K.MIZRA LLC,

     Plaintiff,

v.

CITRIX SYSTEMS, INC. and
CLOUD SOFTWARE GROUP, INC.,

     Defendants.

_____/

**DEFENDANTS' AMENDED ANSWER AND AFFIRMATIVE DEFENSES**
**TO PLAINTIFF'S COMPLAINT**

     Defendants Citrix Systems, Inc. and Cloud Software Group, Inc. (collectively, "Defendants"), by and through their undersigned counsel, hereby submit their Amended Answer and Additional Defenses ("Answer") to the Complaint for Patent Infringement ("Complaint") filed by Plaintiff K.Mizra LLC. ("Plaintiff" or "K.Mizra") (Dkt. No. 1).[1]

     Defendants respond below to the allegations contained in the numbered paragraphs of the Complaint. Defendants deny all allegations in the Complaint unless expressly admitted in the following paragraphs. Any factual allegation admitted below is admitted only as to the specific admitted facts, and not as to any purported conclusions, characterizations, or implications that might follow from the admitted facts.

---

[1] Pursuant to Fed. R. Civ. P. 15(a)(2), Plaintiff K.Mizra consented to the filing of this Amended Answer in writing on November 12, 2025.

1

## INTRODUCTION

**Complaint No. 1:** K.Mizra is a patent licensing company run by experienced management. The company focuses on high value, high quality patents with a global reach. It owns patent portfolios originating with a wide array of inventors, including portfolios developed by well-known multinationals such as IBM, Intel, Rambus and others, as well as from research institutes such as Nederlandse Organisatie voor Toegespast Natuurwetenschappelijk Onderzoek (Netherlands Organization for Applied Scientific Research). By focusing on high quality patents, K.Mizra provides a secondary market for inventors to recoup their research and development investments and to continue their innovations. K.Mizra offers licenses to its patents on reasonable terms and in this way plays an important part in the development of the technologies that improve all our lives.

**Answer to Complaint No. 1:** Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 1 of the Complaint and on that basis deny them.

**Complaint No. 2:** K.Mizra is the owner by assignment of United States Patent No. 8,234,705 ("the '705 Patent" or "the Asserted Patent"). The Asserted Patent was involved in an unsuccessful *Inter Partes* Review Proceeding ("IPR") and several now-resolved federal court litigations, and was originally invented by two highly respected and prolific individual inventors, James A. Roskind and Aaron T. Emigh.

**Answer to Complaint No. 2:** Paragraph 2 contains opinions and legal arguments that do not require a response. Defendants lack sufficient information to form a belief as to the truth of the remaining allegations set forth in Paragraph 2 of the Complaint and on that basis deny them.

**Complaint No. 3:** The Asserted Patent was originally owned by Dr. Roskind and Mr. Emigh's company, Radix Labs, LLC. Dr. Roskind and Mr. Emigh were then, and remain today,

focused on innovation, conducting new research, developing new technologies, and creating new and innovative computer products.

**Answer to Complaint No. 3:** Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 3 of the Complaint and on that basis deny them.

**Complaint No. 4:** Dr. Roskind, one of the two inventors of the Asserted Patent, has bachelor's, master's, and doctorate degrees from the Massachusetts Institute of Technology in both electrical engineering and computer science, and is the named inventor of over 300 U.S. patents. He has worked for Netscape as the Chief Architect and as the Netcenter Security Architect and was a cofounder for Infoseek, a company that was eventually acquired by Disney for $770 million. He was also a key developer of Google's "transport protocol" that provides the tech giant billions of dollars in value every year.

**Answer to Complaint No. 4:** Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 4 of the Complaint and on that basis deny them.

**Complaint No. 5:** Mr. Emigh, the other named inventor of the Asserted Patent, graduated from the University of California, Santa Cruz with degrees in linguistics and computer and information sciences, and is the named inventor of over 140 patents. Prior to working with Dr. Roskind, Mr. Emigh worked in various positions developing software, including working as a software manager, architect, and engineer for Unicom and working as a manager for the software development and technical marketing groups for Philips TriMedia. He has founded or co-founded many companies, in addition to Radix Labs, LLC, including CommerceFlow, Inc., which was acquired by eBay for its technology that Mr. Emigh helped develop.

**Answer to Complaint No. 5:** Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 5 of the Complaint and on that basis deny them.

**Complaint No. 6:** After the Asserted Patent issued, Dr. Roskind and Mr. Emigh recouped their research and development investment by selling their rights thereto and continued on in their individual technology development pursuits. K.Mizra ultimately acquired the Asserted Patent and licensed it to many of the who's-who of the tech world. Some of the accused infringers chose to test the validity of the Asserted Patent before settling their lawsuits involving the Asserted Patent. For instance, a few accused infringers of the Asserted Patent previously sought IPR by the Patent Trial and Appeal Board ("PTAB"). A Final Written Decision ("Decision") in the IPR found that the petitioners had not shown, by a preponderance of the evidence, that the asserted claims were unpatentable. The IPR Decision was appealed to the U.S. Court of Appeals for the Federal Circuit ("CAFC"), resulting in a procedurally focused remand to the PTAB. Prior to the issuance of the mandate that would have sent the IPR back to the United States Patent and Trademark Office ("USPTO") for further consideration, the parties agreed to move to dismiss the appeal.

**Answer to Complaint No. 6:** Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 6 of the Complaint and on that basis deny them.

**Complaint No. 7:** K.Mizra remains ready, willing, and able to provide commercially-reasonable licenses for its various patented technologies to all entities who wish or need to use them internally or in connection with products or services offered to others. As outlined below, Citrix is one such entity.

**Answer to Complaint No. 7:** Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 7 of the Complaint and on that basis deny them.

## II. THE PARTIES

**Complaint No. 8:** K.Mizra is a Delaware limited liability company with a mailing address of 777 Brickell Avenue, #500-96031, Miami, Florida 33131, and operates in Florida. K.Mizra is the owner by assignment of the Asserted Patent.

4

**Answer to Complaint No. 8:** Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 8 of the Complaint and on that basis deny them.

**Complaint No. 9:** Citrix Systems is a corporation organized and existing under Delaware law with a principal place of business at 851 W. Cypress Creek Road, Fort Lauderdale, Florida 33309. *See* https://www.citrix.com/contact/offices.html (last accessed April 23, 2025), a true and correct copy of which is attached as Exhibit 1. This exhibit, and all other exhibits referenced in this Complaint, are incorporated by reference in their entireties. On information and belief, Citrix Systems is a subsidiary and/or business unit of Cloud Software Group.

**Answer to Complaint No. 9:** Defendants admit that Citrix Systems is a corporation incorporated under the laws of Delaware and has a principal place of business at 851 W. Cypress Creek Road, Fort Lauderdale, Florida 33309. Defendants admit that Exhibit 1 to the Complaint appears on its face to be a copy of Citrix Systems, Inc.'s website showing its corporate headquarters. Defendants admit that Citrix Systems, Inc. is a business unit of Cloud Software Group, Inc. Defendants deny the remaining allegations of Paragraph 9 of the Complaint.

**Complaint No. 10:** Citrix Systems may be served through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301-2525.

**Answer to Complaint No. 10:** Defendants admit that Citrix Systems, Inc. has a registered agent, Corporation Service Company, located at 1201 Hays Street, Tallahassee, Florida 32301-2525. The remainder of Paragraph 10 contains opinions and legal arguments that do not require a response.

**Complaint No. 11:** Cloud Software Group is a corporation organized and existing under Delaware law with a principal place of business at 851 W. Cypress Creek Road, Fort Lauderdale,

Florida 33309. A printout from the website of the Florida Department of State, Division of Corporations, showing details for Cloud Software Group, Inc., is attached as Exhibit 2.

**Answer to Complaint No. 11:** Defendants admit that Cloud Software Group, Inc. is a corporation incorporated under the laws of Delaware and has a principal place of business at 851 W. Cypress Creek Road, Fort Lauderdale, Florida 33309. Defendants admit that Exhibit 2 to the Complaint appears on its face to be a printout copy of the Florida Department of State, Division of Corporations' website showing business details for Cloud Software Group, Inc. Defendants deny the remaining allegations of Paragraph 11 of the Complaint.

**Complaint No. 12:** On information and belief, Cloud Service Group operates a sales office for Citrix products, including products including the Secured Private Access solution, at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

**Answer to Complaint No. 12:** Defendants admit a sales office for Citrix branded products is located at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309. Defendants deny the remaining allegations of Paragraph 12 of the Complaint.

**Complaint No. 13:** Cloud Software Group may be served through its registered agent, CT Corporation System, 1200 S. Pine Island Road, Plantation, Florida 33324.

**Answer to Complaint No. 13:** Defendants admit that Cloud Software Group, Inc. has a registered agent, CT Corporation System, located at 1200 S. Pine Island Road, Plantation, Florida 33324. The remainder of Paragraph 13 contains opinions and legal arguments that do not require a response..

## III. JURISDICTION AND VENUE

**Complaint No. 14:** This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*, including 35 U.S.C. §§ 271, 281, and 284, among others.

The Court has subject-matter jurisdiction over the claims raised in this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**Answer to Complaint No. 14:**  Defendants admit that this is an action purporting to arise under the patent laws of the United States and that the Court has jurisdiction over the subject matter of this action.

**Complaint No. 15:**  This Court has personal jurisdiction over Citrix by virtue of, *inter alia*, its principal place of business in Fort Lauderdale, Florida; its appointment of a registered agent in Florida; its conduct of business in this District; its purposeful availment of the rights and benefits of Florida law; and its substantial, continuous, and systematic contacts with the state of Florida and this District. Citrix further: (1) intentionally markets and sells its infringing products directly and through agents to residents of Florida; (2) enjoys substantial income from the state of Florida; and/or (3) directly, by its own actions, and/or in combination with actions of customers and others under its control, has committed acts of infringement in this District at least by making and using infringing systems and using, selling, and offering for sale infringing services.

**Answer to Complaint No. 15:**  For purposes of this action only, Defendants do not contest that they transact business in this District and do not contest that the Court has jurisdiction over Defendants. Defendants deny that they have committed any acts of direct or indirect infringement in this or any other district. Defendants deny the remaining allegations of Paragraph 15 of the Complaint.

**Complaint No. 16:**  Venue is proper in this District pursuant to 28 U.S.C. § 1400(b) because Citrix has its principal place of business (which it designates as its corporate headquarters) in the state of Florida and in this District.

**Answer to Complaint No. 16:** For purposes of this action only, Defendants do not contest that venue is proper in this District.

## IV. GENERAL ALLEGATIONS

### A.   The Asserted Patent

**Complaint No. 17:** K.Mizra is the sole owner by assignment of the Asserted Patent with the full and exclusive right to bring suit to enforce them. (*See* Ex. 3.) K.Mizra is also entitled to sue to collect damages for all past infringement of the Asserted Patent.

**Answer to Complaint No. 17:** Defendants admit that Exhibit 3 to the Complaint appears on its face to be a purported copy of a patent assignment related to United States Patent No. 8,234,705. Defendants lack sufficient information to form a belief as to the truth of all remaining allegations set forth in Paragraph 17 of the Complaint and on that basis deny them.

**Complaint No. 18:** The '705 Patent, titled "Contagion Isolation and Inoculation," was legally issued by the USPTO to inventors Dr. Roskind and Mr. Emigh on July 31, 2012. A true and correct copy of the '705 Patent is attached hereto as Exhibit 4.

**Answer to Complaint No. 18:** Defendants admit that Exhibit 4 to the Complaint appears on its face to be an uncertified copy of United States Patent No. 8,234,705 ("the '705 patent"). Defendants further admit that the face of the '705 patent identifies "Contagion Isolation and Inoculation" as its title and lists James A. Roskind and Aaron T. Emigh as inventors. Defendants lack sufficient information to form a belief as to the truth of all remaining allegations set forth in Paragraph 18 of the Complaint and on that basis deny them.

**Complaint No. 19:** The Asserted Patent claims priority to U.S. Provisional Application No. 60/613,909, filed on September 27, 2004 (the "Provisional Application").

**Answer to Complaint No. 19:**  Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Complaint and on that basis deny them.

**B.      Prior Licensing And Litigation Of The Asserted Patent**

**Complaint No. 20:**  The Asserted Patent has been owned by several entities, in addition to Radix Labs, LLC and K.Mizra, with some of those entities issuing to third parties certain rights to the technologies covered thereby.

**Answer to Complaint No. 20:**  Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 20 of the Complaint and on that basis deny them.

**Complaint No. 21:**  K.Mizra has been involved in a number of actions it had to institute to protect its patent rights, including actions involving the Asserted Patent. Most of those actions resulted in the execution of confidential patent license agreements.

**Answer to Complaint No. 21:**  Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 21 of the Complaint and on that basis deny them.

**Complaint No. 22:**  Citrix is not and has never been a licensee of the Asserted Patent nor had or has any rights to use technologies covered by the Asserted Patent. Citrix thus has no ownership or other rights (and is entitled to no rights) relating to the Asserted Patent.

**Answer to Complaint No. 22:** Defendants deny the statements and allegations of Paragraph 22 of the Complaint insofar as they contain opinions and legal arguments rather than factual assertions and therefore do not require a response. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 22 of the Complaint.

C.     **Computer Network Security Problems In 2004 Solved By The Asserted Patent**

**Complaint No. 23:**  The technology described in the Asserted Patent was invented by Dr. Roskind and Mr. Emigh, two colleagues living in the same area who had similar interests in innovating computer-related technologies. In 2003, the inventors decided to create a business— Radix Labs, LLC—which focused on developing intellectual property related to various computer technologies, including computer network security technologies. The inventors focused on conceiving and reducing to practice inventions that they knew were needed (or soon would be needed) in the computer networking industry and then on drafting patent applications to capture and protect their technological innovations. In September 2004, the inventors filed the Provisional Application to which the Asserted Patent claims priority. The Provisional Application described technology that focused on securing a computer network against the threats to which it was exposed when computer endpoints (e.g., laptop computers) were connected to a computer network. The Provisional Application, and by natural extension the Asserted Patent, also focuses on remedying identified threats and quarantining those threats to mitigate any damage to the secured network.

**Answer to Complaint No. 23:**  Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 23 of the Complaint and on that basis deny them.

**Complaint No. 24:**  Claims of the Asserted Patent are directed to technological solutions that address specific challenges grounded in computer network security. Maintaining the security of computer systems and networks is a tremendous concern for modern enterprises, since a breach of an internal network can have severe repercussions, including major financial losses, data theft, disclosure of sensitive information, network disruptions, data corruption, etc. The inventors of the Asserted Patent understood that while a network security appliance or hardware can be adept at

keeping out unwanted external intrusions from the network, the most exploitable vulnerabilities of most networks are the end-user computers that roam throughout various public and private network domains, potentially exposing those computers to infection and then accessing and potentially infecting the entire and presumably secure computer network.

**Answer to Complaint No. 24:** Paragraph 24 of the Complaint contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny these allegations.

**Complaint No. 25:** For example, the '705 Patent explains that "[l]aptop and wireless computers and other mobile systems pose a threat to elements comprising and/or connected to a network service provider, enterprise, or other protected network to which they reconnect after a period of connection to one or more networks and/or systems that are not part of the service provider, enterprise, or other protected network. By roaming to unknown domains, such as the Internet, and/or connecting to such domains through public, wireless, and/or otherwise less secure access nodes, such mobile systems may become infected by computer viruses, worms, backdoors, and/or countless other threats and/or exploits and/or have unauthorized software installed; have software installed on the mobile system by an operator of the protected network for the protection of the mobile system and/or the protected network removed or altered without authorization and/or have configurations, settings, security data, and/or other data added, removed, and/or changed in authorized ways and/or by unauthorized person[s]." (*See, e.g.*, Ex. 4 at 1:14–31.)

**Answer to Complaint No. 25:** Defendants admit that Paragraph 25 of the Complaint recites language that appears in the '705 patent. Defendants deny the remaining allegations set forth in Paragraph 25 of the Complaint.

**Complaint No. 26:** The solution to these problems—as specified and claimed in the Asserted Patent—was an advanced departure from the conventional network access control solutions then in use and was then, as it remains today, patent eligible, highly valuable, novel, and non-obvious technology.

**Answer to Complaint No. 26:** Defendants deny the statements and allegations of Paragraph 26 of the Complaint insofar as they contain opinions and legal arguments rather than factual assertions and therefore do not require a response. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 26 of the Complaint.

**D.    K.Mizra's Asserted Patent Claims Are Presumed Valid**

**Complaint No. 27:** K.Mizra asserts that at least, and without limitation, Claim 19 of the '705 Patent has been directly infringed, either literally or under the doctrine of equivalents. K.Mizra reserves the right to assert additional claims of the Asserted Patent, including both independent and dependent claims, pursuant to the Court's (and other applicable) rules and procedures and as discovery progresses. These claims are referred to herein as the "Asserted Claims."

**Answer to Complaint No. 27:** Defendants deny the allegations set for in Paragraph 27 of the Complaint.

**Complaint No. 28:** None of the Asserted Claims are directed to abstract ideas, and each employs inventive concepts and is directed to patent-eligible subject matter. All claims of the Asserted Patent are also presumed to be valid and enforceable against Citrix and others.

**Answer to Complaint No. 28:** Defendants deny the statements and allegations of Paragraph 28 of the Complaint insofar as they contain opinions and legal arguments rather than factual assertions and therefore do not require a response. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 28 of the Complaint.

**Complaint No. 29:** Indeed, the Asserted Patent's specification and claims demonstrate that the need satisfied by the inventions of the Asserted Claims was long-felt in the industry and thus unconventional. As one example, the '705 Patent explains that mobile end user devices such as laptops and wireless computers pose a threat to protected network elements because those devices may access unsecure systems and thereby "become infected by computer viruses, worms, backdoors, and/or countless other threats and/or exploits and/or have unauthorized software installed; have software installed on the mobile system by an operator of the protected network for the protection of the mobile system and/or the protected network removed or altered without authorization; and/or have configurations, settings, security data, and/or other data added, removed, and/or changed in unauthorized ways and/or by unauthorized person[s]." (Ex. 4 at 1:23-31.) Similarly, stationary systems such as desktop computers "may become infected, e.g., due to receipt and execution of malicious code via a network or other communication and/or a diskette and/or other removable media." (*Id.* at 1:31-34.) This poses a danger to a protected network because, when the user device connects to the protected network, "a system may infect or otherwise harm resources associated with the protected network before measures can be taken to detect and prevent the spread of such infections or harm." (*Id.* at 1:34-38.) The Asserted Patent's specification further provides that "[t]herefore, there is a need for a reliable way to ensure that a system does not infect or otherwise harm other network resources when connected to a protected network." (*Id.* at 1:38-41.)

**Answer to Complaint No. 29:** Defendants deny the statements and allegations of Paragraph 29 of the Complaint insofar as they contain opinions and legal arguments rather than factual assertions and therefore do not require a response. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 29 of the Complaint.

**Complaint No. 30:** The specification (including the provisions quoted above), the figures (including those included below), and the text related to the figures further illustrate the complex, tiered network system architecture of the inventions captured by the Asserted Claims. These figures include the following:



*(See* Ex. 4 at Fig. 2B.)



*(See id.* at Fig. 10A.)

**Answer to Complaint No. 30:** Defendants admit that Figures 2B and 10A reproduced in Paragraph 30 of the Complaint purport to be figures included in the '705 patent. Defendants deny

the remaining statements and allegations of Paragraph 30 of the Complaint insofar as they contain opinions and legal arguments rather than factual assertions and therefore do not require a response. To the extent a response is required, Defendants deny the remaining allegations set forth in Paragraph 30 of the Complaint.

**Complaint No. 31:** The foregoing demonstrates that the inventions of the Asserted Claims focus on specific tamperproof hardware that must interact with unique software to improve network access control technology and protect a secure computer network and the data stored thereon from infected devices. Thus, the Asserted Claims are eligible as a matter of law for patent protection under step one of *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).

**Answer to Complaint No. 31:** Defendants deny the statements and allegations of Paragraph 31 of the Complaint insofar as they contain opinions and legal arguments rather than factual assertions and therefore do not require a response. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 31 of the Complaint.

**Complaint No. 32:** All actions and steps recited in the Asserted Claims, including the act of quarantining endpoints or other computers, if necessary, requires the involvement of various hardware components running dedicated software both before, during, and after the selection and isolation of an object. Said another way, a claim directed to allowing a machine to automatically and dynamically select and isolate an unsafe device attempting to access a secure network is not simply adding a generic computer component to a fundamentally human process. Rather, it is removing the once-necessary human intervention from a fundamentally mechanical process, an "improvement in the functioning of a" networked system that simply cannot be considered directed to an abstract concept. *Enfish LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016).

**Answer to Complaint No. 32:** Defendants deny the statements and allegations of Paragraph 32 of the Complaint insofar as they contain opinions and legal arguments rather than factual assertions and therefore do not require a response. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 32 of the Complaint.

**Complaint No. 33:** As the specification confirms, the improvement captured by the Asserted Claims is not simply quarantining an infected device, but it is instead a multi-faceted network system involving multiple interrelated software and hardware components to protect a network from known and unknown threats. Specifically, the specification of the Asserted Patent discloses that to reduce the burdens of having to manually identify, connect to, isolate, and remove malicious software from an infected device, the networked system can direct an unclean computer attempting to connect to the secure network, known as the host computer, to a form of remediation, such as downloading a software patch or a software update, removing material from the host computer and/or enabling certain settings, etc. present on the host computer. (*See* Ex. 4 at 1:14–41.) Indeed, the inventions of the Asserted Claims are each tethered to these advances over the art in the 2005 time frame, reciting methods and systems that automatically and dynamically detect an insecure condition by contacting a trusted computing base, receiving a response therefrom, determining whether that response contains a valid identification of cleanliness, and configuring and implementing a remediation action based on what is discovered about the state of an endpoint or "host" computer. (*See, e.g.*, Ex. 4, Claims 12 and 19.) More specifically, the Asserted Claims require a system configured to communicate with a "trusted computing base" to determine when a response includes a valid digitally signed attestation of cleanliness, and to control access to the network accordingly. These Asserted Claims are thus directed to a machine-implemented solution resolving a machine-specific problem: a machine's difficulty in detecting, isolating, and

remediating infected endpoint devices (*e.g.*, host computers) to prevent contagion of and damage to the larger computer network.

**Answer to Complaint No. 33:** Defendants deny the statements and allegations of Paragraph 33 of the Complaint insofar as they contain opinions and legal arguments rather than factual assertions and therefore do not require a response. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 33 of the Complaint.

**Complaint No. 34:** The Asserted Claims are thus directed to a machine-implemented process for (1) determining whether the host computer is required to be quarantined, (2) isolating and inoculating the contagions (including directing the host to software programs and/or code designed to identify undesirable and/or unauthorized states) by quarantining the host, (3) limiting access to the network by the host computer so that the unsafe condition thereof can be remedied, and (4) allowing for remediation of an unsafe or infected host computer. As such, the Asserted Claims recite inventions with specific applications or improvements to technologies in the marketplace and cannot be considered abstract or patent ineligible under relevant law.

**Answer to Complaint No. 34:** Defendants deny the statements and allegations of Paragraph 34 of the Complaint insofar as they contain opinions and legal arguments rather than factual assertions and therefore do not require a response. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 34 of the Complaint.

**E.    Failed IPR**

**Complaint No. 35:** Fortune 100 companies accused of infringing the Asserted Patent have previously filed petitions for IPRs, alleging that the claims of the Asserted Patent should be held invalid as either anticipated or obvious considering art not previously considered. Ultimately,

the PTAB instituted an IPR against the '705 Patent, with similar third party IPRs that were subsequently filed being joined to the first-filed and instituted IPR.

**Answer to Complaint No. 35:**  Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 35 of the Complaint and on that basis deny them.

**Complaint No. 36:**  The PTAB eventually issued its decision holding that no claims of the '705 Patent were unpatentable, finding that no asserted prior art reference alone or in combination satisfied the limitation of "providing . . . an IP address of a quarantine server configured to serve the quarantine notification page" that was present in all claims of the '705 Patent.

**Answer to Complaint No. 36:**  Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 36 of the Complaint and on that basis deny them.

**Complaint No. 37:**  The IPR Decision was then appealed to the CAFC, which reversed the PTAB's Decision on a few narrow procedural issues involving proof that the asserted prior art references would be combined by a person having ordinary skill in the art, as alleged by the petitioners.

**Answer to Complaint No. 37:**  Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 37 of the Complaint and on that basis deny them.

**Complaint No. 38:**  The IPR involving the '705 Patent has since been dismissed by the PTAB at the request of the parties.

**Answer to Complaint No. 38:**  Defendants lack sufficient information to form a belief as to the truth of the allegations set forth in Paragraph 38 of the Complaint and on that basis deny them.

**F.**     **Citrix's Accused Instrumentalities And Services**

**Complaint No. 39:**  Citrix has been making, selling, using, and offering for sale computer network security products and services that infringe the Asserted Patent in violation of 35 U.S.C. § 271. These include, but are not limited to, Citrix's Secure Private Access (SPA) solution (including native cloud and/or on premises implementations) and/or Citrix products including the SPA solution (the "Accused Instrumentalities"), the sale, offer for sale, use and/or manufacture in the United States of which constitutes infringement of at least and without limitation, the Asserted Claims directly, either literally or under the doctrine of equivalents (DoE).

**Answer to Complaint No. 39:**  Defendants deny the allegations set forth in Paragraph 39 of the Complaint.

**G.**     **K.Mizra's Efforts To Work With Citrix**

**Complaint No. 40:**  K.Mizra has contacted Citrix on several occasions seeking to discuss Citrix's infringement. For example, K.Mizra contacted Citrix at least as early as August 2022 in a letter addressing Citrix's potential infringement and directing Citrix to the list of K.Mizra-owned patents found on its website. K.Mizra followed up on this letter in April 2023.

**Answer to Complaint No. 40:**  Defendants admit that K.Mizra sent letters to Citrix in August 2022 and April 2023, but Citrix denies that either letter mentioned the Asserted Patent or addressed Citrix's purported infringement of the Asserted Patent. Defendants deny the remaining allegations in Paragraph 40 of the Complaint and specifically deny that they have committed any acts of infringement.

19

**Complaint No. 41:**  K.Mizra subsequently sent a letter to Citrix which was delivered on January 31, 2025. A copy of the letter is attached as Exhibit 5. The letter was accompanied by a claim chart showing how the Citrix SPA solution infringes the Asserted Patent. Citrix did not respond to this letter.

**Answer to Complaint No. 41:**  Defendants admit that Exhibit 5 to the Complaint purports to be a copy of a letter that is on its face dated January 30, 2025, sent from Plaintiff's counsel to Defendants. Defendants admit they did not respond to this letter. Defendants deny the remaining allegations in Paragraph 41 of the Complaint and specifically deny that Defendants have committed any acts of infringement.

## COUNT I
### (Patent Infringement under 35 U.S.C. § 271 of the '705 Patent)

**Complaint No. 42:**  K.Mizra incorporates paragraphs 1 through 41 as though fully set forth herein.

**Answer to Complaint No. 42:**  Defendants incorporate by reference each of its responses set forth in Paragraphs 1-41 above as if fully set forth herein.

**Complaint No. 43:**  The '705 Patent includes 19 claims.

**Answer to Complaint No. 43:**  Defendants admit that the '705 patent contains 19 claims.

**Complaint No. 44:**  Citrix has directly infringed one or more claims of the '705 Patent by making, importing, using, offering for sale, and/or selling the Accused Instrumentalities, all in violation of 35 U.S.C. § 271(a).

**Answer to Complaint No. 44:**  Defendants deny the allegations set forth in Paragraph 44 of the Complaint.

**Complaint No. 45:** Based    on    publicly    available    information,    the    Accused Instrumentalities satisfy every element of at least Claim 19 of the '705 Patent.

**Answer to Complaint No. 45:**  Defendants deny the allegations set forth in Paragraph 45 of the Complaint.

**Complaint No. 46:**  For example, Claim 19 of the '705 Patent states:

[preamble] A computer program product for protecting a network, the computer program product being embodied in a non-transitory computer readable medium and comprising computer instructions for:

[A] detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network,

[B] wherein detecting the insecure condition includes:

[B1]    contacting a trusted computing base associated with a trusted platform module within the first host,

[B2]    receiving a response, and determining whether the response includes a valid digitally signed attestation of cleanliness,

[C] wherein the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch or a patch level associated with a software component on the first host;

[D] when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network,

[E] wherein preventing the first host from sending data to one or more other hosts associated with the protected network includes

[E1]    receiving a service request sent by the first host, serving a quarantine notification page to the first host when the service request comprises a web server request,

[E2]    and in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not

associated with a remediation host configured to provide data usable to remedy the insecure

condition; and

> [F] permitting the first host to communicate with the remediation host.

(Ex. 4 at 22:14-49.)

**Answer to Complaint No. 46:** Defendants admit that Paragraph 46 of the Complaint recites language that appears in claim 19 of the '705 patent. The remaining portion of Paragraph 46 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny these allegations.

**Complaint No. 47:** As for the preamble of Claim 19, to the extent that it is determined to be limiting, the Accused Instrumentalities provide the features described in the preamble, which recites a "computer program product for protecting a network." Citrix's SPA solution provides for secure access to protected network resources whether stored in the cloud or in an on-premises datacenter.

## Citrix solutions for ZTNA

With Citrix, you can deliver secure access to managed, unmanaged, and BYOD devices alike—without compromising the end user experience. Citrix Secure Private Access provides adaptive access to all corporate applications, whether they're deployed in the cloud or on-premises datacenter. This cloud-based ZTNA solution provides access only at the application level, allowing you to strengthen your security posture and replace your VPN to avoid common issues like network-level attacks.

(*See* What is zero trust network access (ZTNA)?, available at https://www.citrix.com/glossary/what-is-zero-trust-network-access.html (last accessed April 23, 2025).) For example, Citrix touts that its SPA product "offers Adaptive Authentication, single sign-on support, enhanced security controls for the applications."



(*See* Ex. 6, Secure Private Access (SPA) (available at https://docs.citrix.com/en-us/citrix-secure-private-access/service/spa-solution-overview.html) (published December 5, 2024) (last accessed April 23, 2025).) The SPA solution includes a Device Posture service that allows the SPA solution to ensure that the end user device meets certain criteria before connecting to the protected network.

> Device posture service allows an admin to define policies to check the posture of endpoint devices trying to access corporate resources remotely. Based on the compliance status of an endpoint, the device posture service can deny access or provide restricted/full access to corporate applications and desktops.
>
> When an end user initiates a connection with Citrix Workspace, the Device Posture client collects information about the endpoint parameters and shares this information with the Device Posture service to determine if the posture of the endpoint meets policy requirements.
>
> The integration of the Device Posture service with Citrix Secure Private Access enables secure access to SaaS, Web, TCP, and UDP apps from anywhere, delivered with the resiliency and scalability of Citrix Cloud. For details, see Device Posture.

(*Id.*) Citrix explains that the "Device Posture service is a cloud-based solution that helps admins to enforce certain requirements that the end devices must meet to gain access to Citrix DaaS (virtual apps and desktops) or Citrix Secure Private Access resources (SaaS, Web apps, TCP, and UDP apps)."

> Citrix Device Posture service is a cloud-based solution that helps admins to enforce certain requirements that the end devices must meet to gain access to Citrix DaaS (virtual apps and desktops) or Citrix Secure Private Access resources (SaaS, Web apps, TCP, and UDP apps). Establishing device trust by checking the device's posture is critical to implement zero-trust-based access. Device Posture service enforces zero trust principles in your network by checking the end devices for compliance (managed/BYOD and security posture) before allowing an end user to log in.

(*See* Ex. 7, Device Posture Overview (available at https://docs.citrix.com/en-us/device-posture/device-posture-overview) (published March 3, 2025) (last accessed April 23, 2025).)

Citrix's Secure Private Access solution is available as a cloud native service, or can be downloaded and managed by the customer. (*See* https://docs.citrix.com/en-us/citrix-secure-private-access (last accessed April 23, 2025); *see also* Deployment Guide: Citrix Secure Private Access On-Premises, available at https://community.citrix.com/tech-zone/build/deployment-guides/secure-private-access-on-premises/ (last accessed April 23, 2025).) The Secure Private Access solution can be downloaded through the Citrix website at https://www.citrix.com/downloads/citrix-secure-private-access/ (last accessed April 23, 2025). Accordingly, and to the extent that the preamble of Claim 19 is somehow limiting, the Accused Instrumentalities would meet the limitation.

**Answer to Complaint No. 47:** Defendants admit that Exhibit 7 to the Complaint purports on its face to be a printout from Citrix's website. Defendants specifically deny that Defendants have committed any acts of infringement. Defendants deny the remaining allegations set forth in Paragraph 47 of the Complaint.

**Complaint No. 48:** Limitation A of Claim 19 requires "detecting an insecure condition on a first host that has connected or is attempting to connect to a protected network." The Accused Instrumentalities also meet all the requirements of limitation A of Claim 19. Citrix's SPA solution "gives IT a set of security controls to protect against threats from BYO devices, giving the users the choice to access their IT-sanctioned applications from any device, whether its managed or BYO." (Ex. 6 at p. 1.) Among these security controls is that the SPA solution "provides the capabilities to scan the end user device before establishing a session by using the Device Posture Service." For example, Citrix's SPA product "provides the capability to scan the end user device before establishing a session by using the Device Posture service."

> Citrix Secure Private Access offers Adaptive Authentication, single sign-on support, enhanced security controls for the applications. Secure Private Access also provides the capabilities to scan the end user device before establishing a session by using the Device Posture service. Based on the Adaptive Authentication or Device Posture results, admins can define the authentication methods for the apps.

(Ex. 6 at p. 1.) For example, when the end user initiates a connection with Citrix's workspace, information is collected about the endpoint user's device parameters to detect an insecure condition of the endpoint device.



Device posture service allows an admin to define policies to check the posture of endpoint devices trying to access corporate resources remotely. Based on the compliance status of an endpoint, the device posture service can deny access or provide restricted/full access to corporate applications and desktops.

When an end user initiates a connection with Citrix Workspace, the Device Posture client collects information about the endpoint parameters and shares this information with the Device Posture service to determine if the posture of the endpoint meets policy requirements.

The integration of the Device Posture service with Citrix Secure Private Access enables secure access to SaaS, Web, TCP and UDP apps from anywhere, delivered with the resiliency and scalability of Citrix Cloud. For details, see Device Posture.

(*See id.* at p. 2.)

**Answer to Complaint No. 48:**  Defendants admit that Exhibit 6 to the Complaint purports on its face to be a printout from Citrix's website. Defendants specifically deny that Defendants have committed any acts of infringement. Defendants deny the remaining allegations set forth in Paragraph 48 of the Complaint.

**Complaint No. 49:**  Limitation B1 of Claim 19 requires that "detecting [an] insecure condition includes . . . contacting a trusted computing base associated with a trusted platform module within the first host." The Accused Instrumentalities meet these requirements by using the Device Posture service of the Secure Protected Access solution. For example, the Citrix SPA solution supports integration of the Device Posture service with Microsoft Intune.



## Third-party integration with the Device Posture service

In addition to the native scans offered by the Device Posture service, the service can also be integrated with the following third-party solutions on Windows and macOS.

- Microsoft Intune. For details, see Microsoft Intune integration with Device Posture.

- CrowdStrike. For details, see CrowdStrike integration with Device Posture.

(Ex. 7 at p. 4.) When integrating with Microsoft Intune, the Citrix SPA solution is configured to contact a trusted computing base associated with a trusted platform module within the end user

device, ensuring that only secure, compliant devices can access network resources.

This week is all about adding an additional layer of protection to the enrollment of Windows devices. That additional layer of protection is Windows enrollment attestation. Windows enrollment attestation is focused on making the process of enrolling into Microsoft Intune more secure and trustworthy for Windows devices. It relies on using the Trusted Platform Module (TPM) to store the private keys of the MDM certificate from Microsoft Intune and the access token from Microsoft Entra. That information is attested during the enrollment of Windows devices, making it less prone to tampering. That should provide better protection against attackers that for example steal an Intune MDM certificate. This blog post will start with a brief introduction about Windows enrollment attestation, followed with the central insights and the available remote actions.

(*See* Ex. 8, Getting started with Windows enrollment attestation, p. 1 (available at https://petervanderwoude.nl/post/getting-started-with-windows-enrollment-attestation/) (published September 30, 2024) (last accessed April 23, 2025).) The TPM provides a secure hardware environment to protect the certificates, safeguarding them from tampering and ensuring that only TPM-validated, certificate-verified devices can connect to sensitive applications and data.

The goal of Windows enrollment attestation is to make devices more secure and trustworthy within the network they join. With this feature, you can check that Windows 10 and 11 devices meet strict security standards during enrollment, using Trusted Platform Module (TPM) technology to enhance their defense against threats. The Windows enrollment attestation feature also confirms and reports on the devices that enroll securely, ensuring the process is reliable.

Here's how it benefits organizations:

**Improved security**: TPM attestation helps detect and address security weaknesses or compromised devices and lowers the chance of unauthorized access or security incidents.

(*See* Windows enrollment attestation, available at https://learn.microsoft.com/en-us/intune/intune-service/enrollment/windows-enrollment-attestation (published March 3, 2025) (last accessed April 23, 2025).) As another example, the Device Posture service may contact a Citrix Device Posture client, also known as the EPA client, that is installed on an end user device.

• Citrix Device Posture client (EPA client): A lightweight application that must be installed on the endpoint device to run device posture scans. This application does not require local admin rights to download and install on an endpoint.

Ex. 7 at p. 2.) Although public information does not confirm whether or not the EPA client uses

26

Trusted Platform Module technology, use of such technology is a way to accomplish the ends of the EPA client in a secure manner. Discovery is needed to confirm the detailed operation of the EPA client in connection with the SPA solution.

**Answer to Complaint No. 49:**  Defendants admit that Exhibit 7 to the Complaint purports on its face to be a printout from Citrix's website. Defendants admit that Exhibit 8 to the Complaint purports on its face to be a printout of a blog post by Peter van der Woude. Defendants specifically deny that Defendants have committed any acts of infringement. Defendants deny the remaining allegations set forth in Paragraph 49 of the Complaint.

**Complaint No. 50:**  Limitation B2 of Claim 19 requires that "detecting the insecure condition" also includes "receiving a response and determining whether the response includes a valid digitally signed attestation of cleanliness." The Accused Instrumentalities also meet all the requirements of limitation B2. For example, when a remote device ("first host") initiates a request to access corporate resources (*i.e.*, a protected network), the Citrix Secure Private Access solution (in conjunction with the Device Posture service) determines whether the end user device is complaint with policy requirements.

> Citrix Secure Private Access offers Adaptive Authentication, single sign-on support, enhanced security controls for the applications. Secure Private Access also provides the capabilities to scan the end user device before establishing a session by using the Device Posture service. Based on the Adaptive Authentication or Device Posture results, admins can define the authentication methods for the apps.

(Ex. 6 at p. 1.)

> Device posture service allows an admin to define policies to check the posture of endpoint devices trying to access corporate resources remotely. Based on the compliance status of an endpoint, the device posture service can deny access or provide restricted/full access to corporate applications and desktops.
>
> When an end user initiates a connection with Citrix Workspace, the Device Posture client collects information about the endpoint parameters and shares this information with the Device Posture service to determine if the posture of the endpoint meets policy requirements.
>
> The integration of the Device Posture service with Citrix Secure Private Access enables secure access to SaaS, Web, TCP and UDP apps from anywhere, delivered with the resiliency and scalability of Citrix Cloud. For details, see Device Posture.

(*Id.* at p. 2.) To accomplish this, the SPA solution determines whether the response includes a valid

digitally-signed attestation of cleanliness.



(*See* Enhancing Device Security with Windows Enrollment Attestation, available at https://patchmypc.com/windows-enrollment-attestation-tpm-device-attestation (published July 16, 2024) (last accessed April 23, 2025).)



(*See* TCG TPM v2.0 Provisioning Guidance, Version 1.0, Revision 1.0, March 15, 2017, available at https://trustedcomputinggroup.org/wp-content/uploads/TCG-TPM-v2.0-Provisioning-Guidance-Published-v1r1.pdf (last accessed April 23, 2025).)

(*See* TCG Remote Integrity Verification: Network Equipment Remote Attestation System, Version 1.0, Revision 9b, June 15, 2019, available at https://trustedcomputinggroup.org/wp-content/uploads/TCG-NetEq-Attestation-Workflow-Outline_v1r9b_pubrev.pdf (last accessed April 23, 2025).)) Thus, the Accused Instrumentalities meet limitation B2 of Claim 19.

**Answer to Complaint No. 50:** Defendants admit that Exhibit 6 to the Complaint purports on its face to be a printout from Citrix's website. Defendants specifically deny that Defendants have committed any acts of infringement. Defendants deny the remaining allegations set forth in Paragraph 49 of the Complaint.

**Complaint No. 51:** Limitation C of Claim 19 requires that "the valid digitally signed attestation of cleanliness includes at least one of an attestation that the trusted computing base has ascertained that the first host is not infested, and an attestation that the trusted computing base has ascertained the presence of a patch, or a patch level associated with a software component on the first host." The Accused Instrumentalities meet these requirements as the Citrix SPA solution allows administrators to enforce access controls based on device attributes, such as operating system (OS) version or app version.

(*See* Ex. 7 at p. 3.)



| Windows | macOS | iOS | IGEL |
|---|---|---|---|
| Citrix Workspace app version | Citrix Workspace app version | Citrix Workspace app version | - |
| Operating System version | Operating System version | Operating System version | - |
| File (exists, file name, and path) | File (exists, file name, and path) | - | File (exists, file name, and path) |
| Geolocation | Geolocation | - | - |
| Network location | Network location | - | - |
| MAC Address | MAC Address | - | - |
| Process (exists) | Process (exists) | - | - |
| Microsoft Endpoint Manager | Microsoft Endpoint Manager | - | - |
| CrowdStrike | CrowdStrike | - | - |
| Device Certificate | Device Certificate | - | - |
| Browser | Browser | - | - |
| Antivirus | Antivirus | - | - |
| Non-Numeric Registry (32 Bit) | - | - | - |
| Non-Numeric Registry (64 Bit) | - | - | - |
| Numeric Registry (32 Bit) | - | - | - |
| Numeric Registry (64 Bit) | - | - | - |
| Windows Update Installation Type | - | - | - |
| Windows Update Installation Last Update Check | - | - | - |

(*See id.* at pp. 3-4.)



(*See* Ex. 9, Device Posture, p. 14, (available at https://docs.citrix.com/en-us/device-posture/device-posture.pdf) (published April 22, 2025) (last accessed April 23, 2025).) Citrix's SPA products allow for conditional access based on a set of configurations that control which devices have access to various services and data resources:



About Device posture

Conditional access is a set of configurations that control which devices have access to various services and data sources. With conditional access, you can create device postures which collect security-related device data, such as OS and browser version, disk encryption and antivirus status. With this data you can define and enforce application access control policies.

(*See* Ex. 10, Device Posture check for Citrix Workspace 2021, pg. 3, (available at https://www.citrix.com/blogs/wp-content/uploads/2023/02/Device-posture-service-handbook.pdf?srsltid=AfmBOoq08-HSo8dPjZ8U6j-6dXC1wSKewGRWTchVPlL-WM-Jtef9yC26) (last accessed April 23, 2025).) Accordingly, the Accused Instrumentalities meet limitation C of Claim 19.

**Answer to Complaint No. 51:** Defendants admit that Exhibit 7 to the Complaint purports on its face to be a printout from Citrix's website. Defendants admit that Exhibit 9 to the Complaint purports on its face to be Citrix product documentation. Defendants specifically deny that Defendants have committed any acts of infringement. Defendants deny the remaining allegations set forth in Paragraph 51 of the Complaint.

**Complaint No. 52:** Limitation D of Claim 19 requires that "when it is determined that the response does not include a valid digitally signed attestation of cleanliness, quarantining the first host, including by preventing the first host from sending data to one or more other hosts associated with the protected network." The Accused Instrumentalities further meet these requirements by having the Citrix SPA products quarantine noncompliant, i.e., unclean, end point devices attempting to connect to the protected network or access corporate resources to prevent potential security threats:



(*See* Ex. 7 at p. 3.)

Device posture service allows an admin to define policies to check the posture of endpoint devices trying to access corporate resources remotely. Based on the compliance status of an endpoint, the device posture service can deny access or provide restricted/full access to corporate applications and desktops.

When an end user initiates a connection with Citrix Workspace, the Device Posture client collects information about the endpoint parameters and shares this information with the Device Posture service to determine if the posture of the endpoint meets policy requirements.

The integration of the Device Posture service with Citrix Secure Private Access enables secure access to SaaS, Web, TCP and UDP apps from anywhere, delivered with the resiliency and scalability of Citrix Cloud. For details, see Device Posture.

(Ex. 6 at p. 2.) Accordingly, the Accused Instrumentalities meet limitation D of Claim 19.

**Answer to Complaint No. 52:** Defendants admit that Exhibit 7 to the Complaint purports on its face to be a printout from Citrix's website. Defendants specifically deny that Defendants have committed any acts of infringement. Defendants deny the remaining allegations set forth in Paragraph 52 of the Complaint.

**Complaint No. 53:** Limitation E1 of Claim 19 requires that "preventing the first host from sending data to one or more other hosts associated with the protected network includes . . . receiving a service request sent by the first host [and] serving a quarantine notification page to the first host when the service request comprises a web server request." The Accused Instrumentalities meet these requirements because when Citrix's SPA product employs the Conditional Access policy engine and it determines that a device ("first host") is non-compliant with security policies,

the device is restricted from authenticating and accessing company resources and is provided with a notification page ("quarantine notification page").



(*See* Ex. 10 at p. 5). The quarantine notification page may be customized by the customer.



(*See* Ex. 11, Configure Device Posture global settings, p. 4 (published February 21, 2025) (available at https://docs.citrix.com/en-us/device-posture/device-posture-global-settings.html) (last accessed April 23, 2025).)



(*See id.*) Accordingly, the Accused Instrumentalities meet limitation E1 of Claim 19.

**Answer to Complaint No. 53:** Defendants admit that Exhibit 10 to the Complaint purports on its face to be Citrix presentation slides. Defendants admit that Exhibit 11 to the Complaint purports on its face to be a printout from Citrix's website. Defendants specifically deny that Defendants have committed any acts of infringement. Defendants deny the remaining allegations set forth in Paragraph 53 of the Complaint.

**Complaint No. 54:**  Limitation E2 of Claim 19 requires that "preventing the first host from sending data to one or more other hosts associated with the protected network includes" "in the event the service request comprises a DNS query, providing in response an IP address of a quarantine server configured to serve the quarantine notification page if a host name that is the subject of the DNS query is not associated with a remediation host configured to provide data usable to remedy the insecure condition." The Accused Instrumentalities also meet all the requirements of limitation E2 of Claim 19.



(Screenshot from YouTube video "Integrate Citrix Device Posture Service with Microsoft Intune," available at https://www.youtube.com/watch?v=N85XOxzBtTU (at 1:22) (last accessed April 23, 2025).)

Accordingly, the Accused Instrumentalities meet limitation E2 of Claim 19.

**Answer to Complaint No. 54:** Defendants deny the allegations set forth in Paragraph 54 of the Complaint.

**Complaint No. 55:** Limitation F of Claim 19 requires "permitting the first host to communicate with the remediation host." For example, the SPA solution provides for continuous monitoring which allows the SPA solution to dynamically grant or deny access.

| 3. Continuous monitoring. | Contextual and Adaptive Access Control: Citrix |
|---|---|
| Granular visibility and the continuous monitoring of network traffic, user activities, and device behavior gives security teams heightened visibility in their environments. This empowers security teams to detect and respond to potential threats by promptly identifying anomalous behavior or malicious activities within the network. | provides granular control over resource access based on contextual factors such as user identity, device posture, network, geolocation, and behavior. Citrix also integrates with 3rd party detection response and unified endpoint management solutions for device posture. By incorporating these contextual attributes into access control policies, organizations can enforce a zero-trust approach by dynamically granting or denying access to resources based on real-time risk assessments. |
| Based on the evaluation of these attributes, Citrix adjusts access privileges based on real-time context and facilitates continuous monitoring of user behavior to detect anomalous activities. | |

(*See* Zero Trust & Citrix, available at https://www.citrix.com/content/dam/citrix/en_us/documents/white-paper/zero-trust-and-

citrix.pdf (last accessed April 23, 2025).)



(*See* Device Posture logs and events, available at https://docs.citrix.com/en-us/device-posture/device-posture-logs.html (published December 17, 2024) (last accessed April 23, 2025).) Accordingly, the Accused Instrumentalities meet limitation F of Claim 19.

**Answer to Complaint No. 55:** Defendants specifically deny that Defendants have committed any acts of infringement. Defendants deny the remaining allegations set forth in Paragraph 55 of the Complaint.

**Complaint No. 56:** Additionally, and/or alternatively, Citrix has indirectly infringed and continues to indirectly infringe one or more of the claims of the '705 Patent, in violation of 35 U.S.C. § 271(b) by actively inducing users of the SPA system and/or devices operating in the SPA ecosystem to directly infringe one or more claims of the '705 Patent. For example, (a) Citrix had actual knowledge of or was willfully blind to the existence of the '705 Patent no later than January 31, 2025, when it received the letter attached as Exhibit 5, and (b) Citrix intentionally causes, urges, or encourages users of the Accused Instrumentalities to take action that, when taken, directly infringe one or more claims of the '705 Patent. Citrix's encouragement is accomplished by promoting, advertising, and instructing customers and potential customers to use the Accused Instrumentalities and/or devices utilizing the Accused Instrumentalities, including infringing uses thereof. Citrix knows (based on the claim chart previously provided by K.Mizra and/or after

reading this Complaint should know) that its actions will induce users of the SPA products and ecosystem to directly infringe one or more claims of the '705 Patent, and users thereof directly infringe one or more claims of the '705 Patent. For instance, at a minimum, Citrix has supplied and continues to supply the Accused Instrumentalities to customers while knowing that installation and use thereof will infringe one or more claims of the '705 Patent.

**Answer to Complaint No. 56:**  Defendants admit that Exhibit 5 to the Complaint purports to be a copy of a letter that is on its face dated January 30, 2025, sent from Plaintiff's counsel to Defendants. Defendants deny the remaining allegations set forth in Paragraph 56 of the Complaint and specifically deny that they have committed any acts of infringement.

**Complaint No. 57:**  Citrix's acts of infringement have occurred within this District and elsewhere throughout the United States.

**Answer to Complaint No. 57:**  Defendants deny the allegations set forth in Paragraph 57 of the Complaint.

**Complaint No. 58:**  As a result of Citrix's infringing conduct, K.Mizra has suffered damages. Citrix is liable to K.Mizra in an amount that adequately compensates K.Mizra for Citrix's infringement in an amount that is no less than a fully paid-up, lump-sum, reasonable royalty, together with interest and costs as fixed by this Court under 25 U.S.C. § 284.

**Answer to Complaint No. 58:**  Defendants deny the allegations set forth in Paragraph 58 of the Complaint.

## **REQUEST FOR RELIEF**

Defendants deny that Plaintiff is entitled to any relief whatsoever in this action, either as prayed for in the Complaint or otherwise.

## **JURY DEMAND**

Plaintiff's demand for a jury trial does not contain facts that Defendants must admit or deny.

\* \* \*

## AFFIRMATIVE DEFENSES

Without altering any applicable burden of proof, Defendants assert the following affirmative and other defenses. Discovery has not begun and therefore Defendants have not yet had sufficient time and opportunity to collect and review all the information that may be relevant to the matters and issues raised herein. Thus, Defendants reserve the right to seek amendment of, modify, and/or expand these defenses and to take further positions as discovery proceeds in this action. Furthermore, to the extent Plaintiff amends the Complaint, Defendants reserve the right to amend this Answer and Affirmative Defenses.

## FIRST DEFENSE
### (Noninfringement)

1.      Defendants have not infringed, and currently ~~does~~do not infringe, any valid claim of U.S. Patent No. 8,234,705 (the "'705 patent") directly, indirectly, contributorily, by inducement, under the doctrine of equivalents, or in any other manner. Defendants' products and/or services identified by Plaintiff in the Complaint, and any other of Defendants' products and/or services alleged to infringe, do not infringe the '705 patent.

## SECOND DEFENSE
### (Invalidity)

2.      One or more of the claims of the '705 patent are invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more provisions of 35 U.S.C. §§ 101 *et seq.*, including at least 35 U.S.C. §§ 101, 102, 103 and~~/or~~ 112.

3.     Specifically, all of the asserted claims are invalid under 35 U.S.C. §102 for at least the following non-limiting reasons:  the asserted claims are invalid under 35 U.S.C. §102 in view of at least any reference listed on the face of the patent, cited or referred to in the prosecution histories of the patents at issue, foreign counterparts to those patents, and related U.S. and foreign patents, and the prior art identified by any party in any litigation involving the asserted patent in any court, proceeding, or tribunal, including: Netskope Inc. v. K.Mizra LLC, C.A. No. 3:25-cv-04833 (NDCA); Netskope Inc. v. K.Mizra LLC, C.A. No. 5:25-cv-04833 (NDCA); K.Mizra LLC v. Google LLC, 1:25-cv-00236 (WDTX); K.Mizra LLC v. SonicWall US Holdings Inc., C.A. No. 1:25-cv-0047 (DDE); K.Mizra v. Hewlett Packard Enterprise Co. et al., C.A. No. 2:21-cv-00305 (EDTX); K.Mizra LLC v. Broadcom Corp. et al., C.A. No. 2:21-cv-00247 (EDTX); K.Mizra v. Forescout Techs. Inc., C.A. No. 2:21-cv-00248 (EDTX); K.Mizra v. Fortinet Inc., C.A. No. 2:21-cv-00249 (EDTX); K. Mizra v. Cisco Systems, C.A. No. 6:20-cv-01031 (WDTX); IPR2025-01436; IPR2025-01115; IPR2022-00084; IPR2022-00081; IPR2022-00593.

4.     The asserted patent is further invalid under 35 U.S.C. §102 over the prior art references identified by any party in any litigation related to U.S. Patent No. 9,516,048, which is a patent family member to the asserted patent, entitled "Contagion Isolation and Inoculation Via Quarantine," naming the same inventors as the asserted patent, before any tribunal, including at least K.Mizra LLC v. Google LLC, 1:25-cv-00236 (WDTX); K.Mizra LLC v. SonicWall US Holdings Inc., C.A. No. 1:25-cv-0047 (DDE); K.Mizra v. Hewlett Packard Enterprise Co. et al., C.A. No. 2:21-cv-00305 (EDTX); K.Mizra LLC v. Broadcom Corp. et al., C.A. No. 2:21-cv-00247 (EDTX); K.Mizra v. Forescout Techs. Inc., C.A. No. 2:21-cv-00248 (EDTX); K.Mizra v. Fortinet Inc., C.A. No. 2:21-cv-00249 (EDTX); Netskope Inc. v. K.Mizra LLC, C.A. No. 3:25-cv-04833 (NDCA); Netskope Inc. v. K.Mizra LLC, C.A. No. 5:25-cv-04833 (NDCA); K.Mizra LLC v.

Google LLC (WDTX); K.Mizra LLC v. SonicWall US Holdings Inc., C.A. No. 1:25-cv-0047 (DDE); IPR2025-01437; IPR2022-00843.

5.      The asserted patent is further invalid under 35 U.S.C. §102 in view of the prior art identified in Defendants' IPR petition, including at least U.S. Patent No. 9,436,820 ("Gleichauf"), U.S. Patent No. 7,747,862 ("Ovadia"), U.S. Patent No. 7,533,407 ("Lewis"), U.S. Patent Pub. No. 2003/0055962 ("Freund"), U.S. Patent Pub. No. 2006/0005009 ("Ball"), U.S. Patent No. 7,571,460 ("Danforth"), U.S. Patent No. 7,568,107 ("Rathi"), U.S. Patent Pub. No. 2004/0177276 ("MacKinnon"), U.S. Patent No. 7,330,977 ("Cromer"), U.S. Patent No. 6,829,654 ("Jungck"), TCG Specification Architecture Overview (Rev. 1.2 Apr. 28, 2004) TPM Main – Part 1 Design Principles, Specification Version 1.2 (Rev. 62 Oct. 2, 2003), U.S. Patent Pub. No. 2003/0061494 ("Girard"), U.S. Patent Pub. No. 2005/0078668 ("Wittenberg"), U.S. Patent Pub. No. 2005/0097199 ("Woodard"), U.S. Patent Pub. No. 2005/0033987 ("Yan").  As an example only, claims 1-19 of the asserted patent are invalid under 35 U.S.C. § 102 over Gleichauf.  As an additional example only, the asserted claims are invalid 35 U.S.C. § 102 over Freund.   Citrix incorporates by reference IPR2025-01468.

6.      The asserted claims are further invalid under 35 U.S.C. § 102 over any prior art reference identified in Defendants' forthcoming contentions in this case, which are hereby incorporated by reference.  The asserted claims are further invalid under 35 U.S.C. § 102 for any reason identified in any invalidity contentions or expert reports regarding the asserted patent or a family member served on K.Mizra by any party now or in the future, which are hereby incorporated by reference.

7.      Additionally, all of the asserted claims are invalid under 35 U.S.C. §103 for at least the following non-limiting reasons:  the asserted claims are invalid under 35 U.S.C. §103 in view

of at least any reference, either individually or in combination, listed on the face of the patent, cited or referred to in the prosecution histories of the patents at issue, foreign counterparts to those patents, and related U.S. and foreign patents, and the prior art identified by any party in any litigation involving the asserted patent in any court, proceeding, or tribunal, including: Netskope Inc. v. K.Mizra LLC, C.A. No. 3:25-cv-04833 (NDCA); Netskope Inc. v. K.Mizra LLC, C.A. No. 5:25-cv-04833 (NDCA); K.Mizra LLC v. Google LLC, 1:25-cv-00236 (WDTX); K.Mizra LLC v. SonicWall US Holdings Inc., C.A. No. 1:25-cv-0047 (DDE); K.Mizra v. Hewlett Packard Enterprise Co. et al., C.A. No. 2:21-cv-00305 (EDTX); K.Mizra LLC v. Broadcom Corp. et al., C.A. No. 2:21-cv-00247 (EDTX); K.Mizra v. Forescout Techs. Inc., C.A. No. 2:21-cv-00248 (EDTX); K.Mizra v. Fortinet Inc., C.A. No. 2:21-cv-00249 (EDTX); K. Mizra v. Cisco Systems, C.A. No. 6:20-cv-01031 (WDTX); IPR2025-01436; IPR2025-01115; IPR2022-00084; IPR2022-00081; IPR2022-00593.

8. The asserted patent is further invalid under 35 U.S.C. §103 over the prior art references, either individually or in combination, identified by any party in any litigation related to U.S. Patent No. 9,516,048, which is a patent family member to the asserted patent, entitled "Contagion Isolation and Inoculation Via Quarantine," naming the same inventors as the asserted patent, before any tribunal, including at least K.Mizra LLC v. Google LLC, 1:25-cv-00236 (WDTX); K.Mizra LLC v. SonicWall US Holdings Inc., C.A. No. 1:25-cv-0047 (DDE); K.Mizra v. Hewlett Packard Enterprise Co. et al., C.A. No. 2:21-cv-00305 (EDTX); K.Mizra LLC v. Broadcom Corp. et al., C.A. No. 2:21-cv-00247 (EDTX); K.Mizra v. Forescout Techs. Inc., C.A. No. 2:21-cv-00248 (EDTX); K.Mizra v. Fortinet Inc., C.A. No. 2:21-cv-00249 (EDTX); Netskope Inc. v. K.Mizra LLC, C.A. No. 3:25-cv-04833 (NDCA); Netskope Inc. v. K.Mizra LLC, C.A. No.

5:25-cv-04833 (NDCA); K.Mizra LLC v. Google LLC (WDTX); K.Mizra LLC v. SonicWall US Holdings Inc., C.A. No. 1:25-cv-0047 (DDE); IPR2025-01437; IPR2022-00843.

9.      The asserted patent is further invalid under 35 U.S.C. §103 in view of the prior art identified in Defendants' IPR petition, including by the grounds identified in the petition and any reference, either individually or in combination, recited therein, including at least U.S. Patent No. 9,436,820 ("Gleichauf"), U.S. Patent No. 7,747,862 ("Ovadia"), U.S. Patent No. 7,533,407 ("Lewis"), U.S. Patent Pub. No. 2003/0055962 ("Freund"), U.S. Patent Pub. No. 2006/0005009 ("Ball"), U.S. Patent No. 7,571,460 ("Danforth"), U.S. Patent No. 7,568,107 ("Rathi"), U.S. Patent Pub. No. 2004/0177276 ("MacKinnon"), U.S. Patent No. 7,330,977 ("Cromer"), U.S. Patent No. 6,829,654 ("Jungck"), TCG Specification Architecture Overview (Rev. 1.2 Apr. 28, 2004) TPM Main – Part 1 Design Principles, Specification Version 1.2 (Rev. 62 Oct. 2, 2003), U.S. Patent Pub. No. 2003/0061494 ("Girard"), U.S. Patent Pub. No. 2005/0078668 ("Wittenberg"), U.S. Patent Pub. No. 2005/0097199 ("Woodard"), U.S. Patent Pub. No. 2005/0033987 ("Yan").  As an example only, claims 1-19 of the asserted patent are invalid under 35 U.S.C. § 103 over Gleichauf in view of Ovadia and Lewis.  As an additional example only, the asserted claims are invalid 35 U.S.C. § 103 over Freund in view of Ball and Danforth.   As still yet further examples only, the asserted claims are invalid under 35 U.S.C. § 103, either individually or in combination, in view of the prior art listed in Defendants' IPR petition.  Citrix incorporates by reference IPR2025-01468.

10.      The asserted claims are further invalid under 35 U.S.C. § 103 over any prior art reference, either individually or in combination, identified in Defendants' forthcoming contentions in this case.  The asserted claims are further invalid under 35 U.S.C. § 103 for any reason identified

in any invalidity contentions or expert reports regarding the asserted patent or a family member served on K.Mizra by any party now or in the future, which are hereby incorporated by reference.

11.     The asserted claims are further invalid under 35 U.S.C. § 101 for at least the following non-limiting reasons:  the asserted claims are invalid under 35 U.S.C. § 101 for the reasons stated in Defendants' Motion to Dismiss. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014).  Specifically, the claims are directed to the abstract idea of protecting a network from an infected host through contagion isolation and inoculation, amounting to the well-known human practice of quarantine.  The patent further does not recite an inventive concept because the patent itself explains that it did not invent the hardware and software components recited in the claims and that the components are neither novel nor used in a novel manner.  Additionally, the ordered combination of claim limitations mirrors well-understood practice, adding nothing inventive.  For each of these reasons, none of the asserted claims is eligible for patent protection.

12.     Courts have found similar claims to be directed to patent-ineligible abstract ideas. *See, e.g.*, *Digital Media Techs., Inc. v. Hulu, LLC*, 2017 WL 4750705, at *7 (N.D. Fla. July 3, 2017); *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1019 (Fed. Cir. 2017); *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1331 (Fed. Cir. 2020).  For example, the *Ericsson* case focused on similar technology as claimed in the '705 patent and is instructive.  See *Ericsson* at 1327 ("[W]e have repeatedly found the concept of controlling access to resources via software to be an abstract idea.").

13.     The asserted claims are also invalid under 35 U.S.C. § 112 for at least the following non-limiting reasons:  the asserted claims are invalid under 35 U.S.C. § 112 for lack of written description or enablement because the specification does not convey to a person of ordinary skill in the art that the inventors were in possession of the claimed invention as of the filing date and/or

the specification does not inform a person of ordinary skill how to make and use the invention without undue experimentation for at least the following non-limiting reasons:

    a.  "detecting an insecure condition on a first host."  For example, "insecure condition" does not appear anywhere in the specification of the asserted patent.  As such, the specification does not convey to a person of ordinary skill in the art that the inventors were in possession of the claimed invention as of the filing date and/or the specification does not inform a person of ordinary skill how to make and use the invention without undue experimentation.

    b.  "trusted computing base associated with a trusted platform module."  For example, the specification of the asserted patent does not convey to a person of ordinary skill in the art that the inventors were in possession of the claimed invention as of the filing date and/or the specification does not inform a person of ordinary skill how to make and use the invention without undue experimentation because the specification does not explain how hardware or software that provides security to a trusted computing base implements the Trusted Platform Module specification from the Trusted Computing Group or trusted platform module.

14.    The asserted claims are also invalid under 35 U.S.C. § 112 for indefiniteness.  For example, at least the following terms are indefinite because they fail to inform a person of ordinary skill in the art, with reasonable certainty, the scope of the claims:

    a.  "detecting an insecure condition on a first host."  For example, "insecure" is a subjective term that involves subjective considerations of risk perception and acceptance, threat modeling, context-specific judgments, and assessor experience. For example, a condition considered "insecure" in a high-stakes environment (e.g.,

critical infrastructure) might be deemed "secure" in a less critical system. The interpretation of security requirements is context-dependent.

b.  "a trusted computing base."  For example, "trusted" is a subjective term that involves subjective considerations of risk perception and acceptance, threat modeling, context-specific judgments, and assessor experience.  For example, a condition considered "untrusted" in a high-stakes environment (e.g., critical infrastructure) might be deemed "trusted" in a less critical system. The interpretation of security requirements is context-dependent.

c.  "a trusted platform module within the first host." For example, "trusted" is a subjective term that involves subjective considerations of risk perception and acceptance, threat modeling, context-specific judgments, and assessor experience. For example, a condition considered "untrusted" in a high-stakes environment (e.g., critical infrastructure) might be deemed "trusted" in a less critical system. The interpretation of security requirements is context-dependent.

15.  Defendants note that the only properly identified asserted claim in Plaintiff's Complaint is claim 19.   Plaintiff has not yet served infringement contentions and the Court has not issued a claim construction order.  Prior claim construction decisions are not binding on this Court.  As such, because Plaintiff has not yet fully explained its infringement theories and the Court has not yet construed the meaning of the claims, Defendants are prejudiced in providing its invalidity defenses at this time.  As a result, Defendants' investigation is ongoing, and Defendant reserves the right to identify and specify additional bases for its affirmative defenses related to invalidity in Defendants' forthcoming invalidity contentions, which are incorporated by reference herein.

## THIRD DEFENSE
### (Equitable Doctrines)

16. ~~3.~~ Plaintiff's infringement claims against Defendants regarding the '705 patent are barred in whole or in part by the doctrines of waiver, estoppel, and acquiescence~~, and/or other applicable equitable doctrines~~.

17. **Waiver**. Defendants incorporate by reference the preceding paragraphs. K.Mizra's actions since the issuance of the asserted patent have been inconsistent with its intent to enforce its rights to the asserted patent against Defendants such that K.Mizra has induced a reasonable belief that its patent rights have been relinquished. The initial release of the accused product, Citrix Secure Private Access ("SPA"), was on or around April 2022 and K.Mizra's complaint suggests that it was aware of SPA since at least August 2022. K.Mizra alleges in its complaint that it contacted Citrix in August 2022 in a letter addressing Citrix's potential infringement, but that letter made no reference to the asserted patent or to any alleged infringing Citrix product. K.Mizra does not contend that it communicated with Citrix at all between August 2022 and January 2025 other than in an April 2023 letter in which it again made no reference to the asserted patent or to any alleged infringing Citrix product and instead offered to licensed patents owned by a different entity. Additionally, K.Mizra never filed any lawsuit until April 2025.

18. Despite the asserted patent issuing 13 years ago, K.Mizra's active litigation history with respect to the asserted patent and family members, and the accused product being available for over three years, K.Mizra took no action with respect to Defendants until it filed suit in April 2025. K.Mizra's inaction demonstrates K.Mizra's inconsistency with respect to asserting its rights such that it has induced a reasonable belief that K.Mizra's rights have been relinquished. K.Mizra

offers no explanation for its delay in filing suit and Citrix would be materially prejudiced if K.Mizra were allowed to proceed with its infringement claim.

19.     **Estoppel**.  Defendants incorporate by reference the preceding paragraphs.  For the same reasons described in the preceding paragraphs, K.Mizra's conduct, through its silence with respect to Citrix, led Citrix to reasonably believe that K.Mizra did not intend to enforce its patent rights.  In particular, in its complaint, K.Mizra alleges that although it contacted Citrix as early as August 2022, it never filed any lawsuit until April 2025.  K.Mizra offers no explanation for its delay in filing suit and Citrix would be materially prejudiced if K.Mizra were allowed to proceed with its infringement claim.

20.     **Acquiescence**.  Defendants incorporate by reference the preceding paragraphs.  For the same reasons described in the preceding paragraphs, K.Mizra was purportedly aware of the alleged infringing activity since August 2022. K.Mizra engaged in conduct that reasonably suggested it consented to any alleged infringement and/or would not assert its rights, including by refraining from sending subsequent communications regarding its August 2022 letter, failing to reference any claim of patent infringement in its April 2023 letter, and failing to file a lawsuit until April 2025.  Citrix relied on K.Mizra's inaction and was materially prejudiced by K.Mizra's conduct and subsequent inaction.

**FOURTH DEFENSE**
**(Exhaustion and License)**

21.     Defendants incorporate by reference the paragraphs above as if recited herein.

22.     4. Plaintiff's infringement claims against Defendants regarding the '705 patent, in whole or in part, are barred by the doctrine of patent exhaustion, license and/or implied license. The product accused of infringement in this case is Citrix Secure Private Access ("SPA").

23. Upon information and belief, in light of the claims of the patent, K.Mizra's allegations of infringement described in its Complaint will necessarily implicate products and services offered by third parties (such as alleged "trusted platform modules" on third-party laptops and other client devices, among other things) that are used in conjunction with SPA.  Given that K.Mizra and its predecessors in interest to the '705 patent have, upon information and belief, licensed the asserted patent to third parties whose products and/or services are used in conjunction with SPA, K.Mizra's claims are barred by the doctrine of patent exhaustion, license and/or implied license.

**FIFTH DEFENSE**
**(Ensnarement)**

24. Defendants incorporate by reference the paragraphs above as if recited herein.

25. 5. Plaintiff is foreclosed from asserting infringement of the '705 patent under the doctrine of equivalents to the extent the scope of such equivalent would ensnare prior art.  Under the ensnarement doctrine, the patentee may not assert "a scope of equivalency that would encompass, or ensnare, the prior art." *Belcher Pharm., LLC v. Hospira, Inc*., 450 F. Supp. 3d 512, 539 (D. Del. 2020) (quoting D*epuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*., 567 F.3d 1314, 1322 (Fed. Cir. 2009)). K.Mizra's Complaint alleges infringement under the doctrine of equivalents.  Upon information and belief, K.Mizra's allegations under the doctrine of equivalents necessarily ensnares the prior art, including as examples only, the prior art referenced above with respect to Defendants second defense regarding invalidity.

26. Defendants note that Plaintiff has not yet served infringement contentions or fully explained its infringement theories.  For example, although the Complaint purports to assert infringement under the doctrine of equivalents, the Complaint wholly fails to explain how or why any claim limitation of the asserted patent is met by the SPA under the doctrine of equivalents.  As

such, Defendants investigation of its defenses is ongoing and Defendants have been prejudiced by Plaintiff's failure to provide detail whatsoever regarding its doctrine of equivalents infringement theory.

**SIXTH DEFENSE**
**(Prosecution History Estoppel)**

27.  Defendants incorporate by reference the paragraphs above as if recited herein.

28.  ~~6.~~ Plaintiff is estopped from construing the claims of the '705 patent in such a way as may cover any of Defendants' products and/or services, in whole or in part, based on statements, representations, and admissions made during the prosecution of the '705 patent.  As discussed above, K.Mizra has indicated that it intends to allege infringement under the doctrine of equivalents.  Upon information and belief, Applicant to the asserted patent surrendered claim scope in response to office actions and in its appeal brief during prosecution.  For example, in Remarks to an Amendment filed January 10, 2010, Applicant appears to have defined "trusted computing base" and "trusted platform module" as "terms of art with specific meanings" in response to an examiner rejection over the Liang reference.  Applicant appears to have defined "trusted computing module" as "both the name of a published specification detailing a secure cryptoprocessor that can store cryptographic keys that protect information, as well as the general name of implementations of that specification, often called the 'TPM chip' or 'TPM Security Device.'" Applicant further appears to have defined "trusted computing base" as "[a] given piece of hardware or software is a part of the TCB if and only if it has been designed to be a part of the mechanism that provides its security to the computer system."  Further, Applicant distinguished these definitions from the disclosure of Liang, which included: "For example, virus monitor 102-1 sends a query 140 to each of the client devices 110-116 requesting confirmation that each has

installed therein the appropriate anti-virus software as determined by the policies contained in the OPP file 135 ...”

29.     Defendants provide this disclosure as an example only.  Defendants note that Plaintiff has not yet served infringement contentions or fully explained its infringement theories. For example, although the Complaint purports to assert infringement under the doctrine of equivalents, the Complaint wholly fails to explain how or why any claim limitation of the asserted patent is met by the SPA under the doctrine of equivalents.  As such, Defendants investigation of its defenses is ongoing and Defendants have been prejudiced by Plaintiff's failure to provide detail whatsoever regarding its doctrine of equivalents infringement theory .

## SEVENTH DEFENSE
### (Limitation on Damages and Costs)

30.     7.Plaintiff's claim for damages is limited under at least 35 U.S.C. §§ 286, and 287, and/or 288(a).

31.     Without limitation, Plaintiff is precluded from seeking pre-suit damages due to its failure to comply with the marking and/or actual notice requirements of 35 U.S.C. § 287(a).

## RESERVATION OF ADDITIONAL DEFENSES

8. Defendants reserve all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other defenses, at law and equity, that may now or in the future be available based on discovery or any other factual investigation concerning this case or any related action.

## JURY DEMAND

9. Defendants demand a trial by jury of all issues so triable in this action.

## REQUEST FOR RELIEF

WHEREFORE, Defendants Citrix Systems, Inc. and Cloud Software Group, Inc. pray for

judgment that:

A.     Plaintiff be denied any of the relief prayed for in its Complaint or to any relief whatsoever;

B.     U.S. Patent No. 8,234,705 has never been, and is not now, infringed by Defendants directly or indirectly, or by any other person using Defendants' accused products and/or services in this judicial district or elsewhere in the United States;

C.     All asserted claims of U.S. Patent No. 8,234,705 are invalid and/or unenforceable;

D.     No damages or royalties are due or owing for any of the acts alleged by Plaintiff in its Complaint against Defendants;

E.     Plaintiff is barred from enforcing or attempting to enforce patent rights as against Defendants; and that

F.     Defendants be awarded its costs (including expert fees), disbursements, and reasonable attorneys' fees pursuant to 35 U.S.C. § 285 as against Plaintiff, and such other and further relief as the Court may deem just and proper.

Dated: ~~October 13,~~ November 12, 2025                Respectfully submitted,

                                                        **DLA PIPER LLP (US)**

                                                        */s/ Ardith Bronson*
                                                        Ardith Bronson, Esq.
                                                        Florida Bar Number: 423025
                                                        ardith.bronson@us.dlapiper.com
                                                        Jose M. Espinosa, Esq.
                                                        Florida Bar Number: 1030890
                                                        jose.espinosa@us.dlaiper.com
                                                        DLA Piper LLP (US)
                                                        200 South Biscayne Boulevard
                                                        Suite 2500
                                                        Miami, Florida 33131
                                                        Telephone: (305) 423-8562

                                                        Michael Strapp, Esq.

Admitted *pro hac vice*
Michael.strapp@us.dlapiper.com
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110
Telephone: (617) 406-6031

*Counsel for Defendants Citrix System, Inc. and Cloud Software Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on ~~October 13~~November 12, 2025, I electronically filed the foregoing document via CM/ECF, which caused a true and correct copy to be served electronically upon all entitled parties.

/s/ Ardith Bronson
Ardith Bronson, Esq.